# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JULIE R. HELVIE,                                     Civ. No. 08-779 (DWF/FLN)

        Plaintiff,

v.                                                           **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

      Defendant has denied Plaintiff Julie Helvie's application for disability insurance benefits

(SSD) under the Social Security Act.  Plaintiff filed a complaint seeking review of the denial of

benefits on March 19, 2008.  The action is now before the Court on Plaintiff's motion for

judgment on the pleadings and Defendant's motion for summary judgment.  Plaintiff is

represented by David G. Kuduk, Esq.  Defendant is represented by Lonnie F. Bryan, Assistant

United States Attorney.  This Court has jurisdiction over the matter pursuant to 42 U.S.C. §

405(g).  It is properly before the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c),

and Local Rule 72.1.  For the reasons stated below it is recommended that Plaintiff's motion for

judgment on the pleadings be granted in part [Docket No. 15]; and Defendant's motion for

summary judgment be denied [Docket No. 20].

## I.     PLAINTIFF'S BACKGROUND

      Plaintiff Julie Helvie was 48-years-old when she filed her application for SSD.  (Tr. 78.)

She has a high school education, work experience as a school bus driver, and as a personal care

attendant for a special needs child.  (Tr. 285-87.)  She is married and has two children, aged thirty and twenty-seven at the time of the hearing.  (Tr. 287-88.)

Plaintiff was in a car accident in June 2001, after which she did not work for a year.  (Tr. 132.)  At the time of the accident, she was driving over fifty miles per hour in the right lane of a four lane highway when a pick-up truck traveling in excess of seventy miles per hour hit her from behind.  (Tr. 132.)  She was forced into oncoming traffic, but was not hit again.  (Tr. 132.)  She had immediate pain in her neck and arm.  (Tr. 132.)  After chiropractic treatment and a year off work, she returned to work driving a school bus.  (Tr. 132.) Pain caused her to miss at least one day a week from work.  (Tr. 132.)  She later quit for fear that she could not control her right arm to drive the bus safely.  (Tr. 132.)  She did not realize her psychological conditions until she began seeing a psychiatrist  who diagnosed agoraphobia and post traumatic stress disorder.  (Tr. 295.)  Plaintiff last worked on January 3, 2005.  (Tr. 80.)

## II.    PROCEDURAL BACKGROUND

### A.    <u>Administrative Process</u>

Plaintiff filed her application for SSD on January 19, 2005, alleging a disability onset date of January 4, 2005.  (Tr. 78-80.)  The application was denied initially and upon reconsideration.  (Tr. 39-40, 36-38.)  Plaintiff requested a hearing, which was held before Administrative Law Judge David K. Gatto on May 14, 2007.  (Tr. 281-307.)  On August 30, 2007, the ALJ issued an unfavorable decision.  (Tr. 22-34.)  The Social Security Administration Appeals Council denied Plaintiff's request for further review.  (Tr. 5-7.)  The denial of review made the ALJ's findings the final decision of the defendant.  42 U.S.C. § 405(g); <u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir. 1992).  Plaintiff seeks review of the denial of benefits

pursuant to 42 U.S.C. § 405(g).

    **B.**    **Medical Records**

Plaintiff had an MRI of her cervical spine on June 29, 2001.  (Tr. 129.)  The MRI indicated "minimal spur and annulus changes at the C2-C3 level" with no other focal abnormalities.  (Tr. 129.)  There are no other medical records until 2005.

Dr. David Bransford at Itasca Psychiatric Services & Assoc. conducted a psychiatric evaluation of Plaintiff on February 14, 2005.  (Tr. 192-93.)  He noted that Plaintiff had considerable difficulty expressing herself initially.  (Tr. 192.)  She then described classic symptoms of PTSD related to a high speed motor vehicle accident.  (Tr. 192.)  She endorsed social isolation, agoraphobia, flashbacks, nightmares, dissociative episodes, and other signs and symptoms.  (Tr. 192.)  Dr. Bransford noted that Plaintiff could only drive a car with great tension and apprehension.  (Tr. 192.)

Plaintiff also described a history of physical and sexual abuse of herself and her sisters during her childhood.  (Tr. 192.)  Disclosing information was overwhelming to her.  (Tr. 192.)  Dr. Bransford recommended Zoloft[1] for PTSD, but Plaintiff was hesitant.  (Tr. 192.)  She was willing to try Zoloft after discussing it with her treating physician, Dr. Edwin Anderson at Grand Itasca Clinic & Hospital.  (Tr. 131.)  Dr. Bransford also recommended that Plaintiff begin psychotherapy with Eileen Tiegland.  (Tr. 192.)  He opined that PTSD clearly disabled her.  (Tr. 192.)

---

[1]    Zoloft is indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, post-traumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder. PHYSICIAN'S DESK REFERENCE at 2682-83 (Thomson PDR 59th ed. 2005) (hereinafter "PDR").

Plaintiff underwent a consultative examination with Dr. Roger Ralston on March 23, 2005. (Tr. 132-34.) Dr. Ralston noted that Plainitff was involved in a car accident in 1995, and developed neck and arm symptoms. (Tr. 132.) Her symptoms improved over a period of years, and she went back to work driving a bus. (Tr. 132.) She was in another car accident in June 2001, and she suffered immediate severe pain in her neck and arm. (Tr. 132.) She was treated with chiropractic care, and told surgery would not be appropriate. (Tr. 132.) Again, her symptoms improved over time, and she went back to work as a school bus driver. (Tr. 132.) She quit working because she did not feel she could control her right arm safely enough to operate the bus. (Tr. 132.) Dr. Ralston noted that Plaintiff also described a history of anxiety and social phobia since childhood, which was much worse since her 2001 accident. (Tr. 133.)

On physical examination, Plaintiff was weepy and emotional. (Tr. 133.) She exhibited muscle tenderness, but no spasm. (Tr. 133.) Otherwise physical examination, including range of motion, reflexes, and sensory examination, was normal. (Tr. 133-34.) X-rays of Plaintiff's cervical spine showed slight loss of normal cervical lordosis, but were otherwise normal. (Tr. 134.)

On mental status examination, Plaintiff was alert and oriented, able to focus and sustain attention, with no evidence of learning difficulties, hallucinations or delusions. (Tr. 134.) She did, however, appear depressed. (Tr. 134.) Dr. Ralston noted that Plaintiff's second car accident was violent, severe, and frightening. He further stated,

> [s]he has continued pain and paresthesias of the arm. She has nightmares and anxieties about these. Her physical exam today shows no obvious neurologic loss. Medical evaluation up to this point has failed to reveal an explanation for her persistent pain and paresthesias. I suspect that she has had a significant nerve rootlet contusion with resultant symptoms that are aggravated by her post-

traumatic stress disorder.

(Tr. 134.)  Dr. Ralston also noted Plaintiff had difficulty driving, or even riding in a vehicle on freeways.  (Tr. 134.)  He opined that she was at risk for becoming reclusive.  (Tr. 134.)

Dr. Edwin Anderson completed a "Multiple Impairment Questionnaire" on Plaintiff's behalf on September 11, 2005.  (Tr. 139-46.)  He noted that he first treated Plaintiff in February of that year.  (Tr. 139.)  He diagnosed chronic myofascial pain, post traumatic stress disorder, agoraphobia, panic disorder, and [history of] abuse.  (Tr. 139.)  He opined Plaintiff's prognosis was fair to poor.  (Tr. 139.)  He noted that his diagnoses were supported by clinical findings of multiple areas of point tenderness, soft tissue pain, and flat affect.  (Tr. 139.)  He also noted that MRIs and EMGs did not demonstrate disc or nerve etiology for her pain.  (Tr. 140.)  Her pain was in the right shoulder, neck, and ribs.  (Tr. 140.)  He noted that anxiety, twisting, repetitive motion, and driving made Plaintiff's pain worse.  (Tr. 141.)  Zoloft improved her pain.  (Tr. 141.)

According to Dr. Anderson, Plaintiff's pain ranged from a level of six out of ten to a level ten out of ten.  (Tr. 141.)  He opined that Plaintiff could sit three to four hours in an eight hour day, stand and walk three or four hours in an eight hour day, and would need to get up and move around hourly, and sit down again in thirty minutes.  (Tr. 141.)  He opined that Plaintiff could occasionally lift five to ten pounds, and would be limited in use of her right arm.  (Tr. 142.)  He indicated she would have moderate limitations using both upper extremities.  (Tr. 142-43.)

Dr. Anderson opined that Plaintiff's symptoms were likely to last twelve months, and emotional factors, including anxiety, phobias, and PTSD, contributed to the severity of her symptoms and limitations.  (Tr. 144.)  He indicated that Plaintiff was incapable of even low

stress work, based on her therapy and clinic visits.  (Tr. 144.)  He opined Plaintiff would need to

take several breaks of ten to twenty minutes a day, and would be likely to miss work more than

three times a month.  (Tr. 144-45.)  Dr. Anderson indicated that Plaintiff would have additional

psychological limitations, and the need to avoid noise, fumes, gases, temperature extremes,

humidity, heights, and no pushing, pulling, kneeling, bending, or stooping.  (Tr. 145.)

Plaintiff's chiropractor, Scott McBride, wrote two letters to the Disability Determination

Service in support of Plaintiff's claim for disability benefits.  (Tr. 148-49.)  The first letter was

dated February 10, 2005.  (Tr. 149.)  Dr. McBride indicated that he treated Plaintiff

intermittently for several years, most recently for injuries to her neck and upper back after a car

accident.  (Tr. 149.)  He described Plaintiff's condition as "chronic cervical thoracic sprain/strain

injury with myofascitis and headaches of cervical spine origin as well as right cervical

radiculitis[2] and right intercostal neuritis[3]."  (Tr. 149.)

Dr. McBride summarized his clinical findings as follows:

> [Plaintiff] presents consistently with mild forward flexed, left
> laterally flexed cervicothoracic antalgia.  Ranges of movement in
> the cervicothoracic region are somewhat restricted with pain.
> Motion palpation consistently demonstrates areas of aberrant
> movement in fixation and the upper cervical and thoracic regions.
> Moderate suboccipital and CT paraspinal muscle spasm and
> tenderness are also consistently present, +4/10.  Some degree of
> motor weakness is noted in the right upper extremity with muscle
> testing.  Subjective intercostal pain is noted on the right side
> consistently as well.

---

[2]     Radiculitis, a synonym for radiculopathy, is a disorder of the spinal nerve roots.
STEDMAN'S MEDICAL DICTIONARY at 1503 (Lippincott Williams & Wilkins, 27th
ed. 2000) (hereinafter "STEDMAN'S").

[3]     Neuritis is inflammation of a nerve.  STEDMAN'S at 1207.

(Tr. 149.)  Dr. McBride opined that Plaintiff's condition was permanent, and her prognosis poor. (Tr. 149.)  He noted that the following activities exacerbate Plaintiff's pain:  any repetitive movement of the neck or back; any repetitive or overhead use of the arms; any repetitive lifting, or lifting in excess of fifteen pounds; any repetitive carrying or carrying in excess of twenty pounds; any repetitive push/pull activity; and any prolonged sitting.  (Tr. 49.)  Dr. McBride acknowledged that he suggested Plaintiff discontinue her work as a bus driver because it was aggravating her condition.  (Tr. 149.)  Dr. McBride's letter of July 19, 2005, to the Disability Determination Service was to the same effect.  (Tr. 148.)

Dr. McBride also completed a Cervical Spine Impairment Questionnaire on Plaintiff's behalf on August 12, 2005, which was consistent with his letters to the DDS.  (Tr. 173-79.)  He indicated on the questionnaire that Plaintiff is not a malingerer, but emotional factors contribute to the severity of her symptoms and limitations.  (Tr. 176.)  He opined that Plaintiff could not tolerate low stress work.  (Tr. 177.)  Dr. McBride's treatment notes for the period between January 3, 2005 and July 14, 2006, reflect treatment for pain and stiffness in the neck, shoulders, upper back, and headaches.  (Tr. 201-06.)

The record contains treatment notes from psychiatrist David Bransford for the period between December 19, 2005 and November 20, 2006.  (Tr. 231-34.)  Dr. Bransford noted on December 19, 2005, that Plaintiff was being treated with Zoloft for PTSD and panic attacks, and treated with Klonopin for acute episodes.  (Tr. 234.)  Dr. Bransford noted that Plaintiff finds two things particularly stressful, phone calls from her father, and driving a car.  (Tr. 234.)  He also noted that Plaintiff appeared sullen and depressed, which was baseline for her.  (Tr. 234.)

Several weeks later, Plaintiff reported an increase in pain, and flashbacks and vivid

dreams about the motor vehicle accident. (Tr. 234.) In March 2006, Plaintiff was doing somewhat better. (Tr. 233.) She was an artist, and had sold some of her paintings. (Tr. 233.) However, in May Dr. Bransford diagnosed Plaintiff with major depressive episode, and borderline personality disorder[4]. (Tr. 233.) He noted that Plaintiff described a great deal of stress about past abuse in her childhood, and stress from an incident when she was driving a school bus. (Tr. 233.) In June, Plaintiff talked about her guilt over not working. (Tr. 232.) She feared her husband coming home and criticizing her, although she had not had such a conflict with him. (Tr. 232.) Dr. Bransford diagnosed dysthymic disorder and PTSD. (Tr. 232.) In August, Plaintiff reported nightmares and upsetting thoughts related to abuse by her father. (Tr. 232.) Dr. Bransford noted Plaintiff was taking Clonazepam[5] to help her sleep, and he diagnosed PTSD. (Tr. 232.)

Dr. Bransford indicated that Plaintiff was improving in October 2006. (Tr. 231.) Although Plaintiff reported that her flashbacks were becoming more intense, Dr. Bransford opined that it could be related to advancements in therapy. (Tr. 231.) The next month, however, Plaintiff reported dreading the holidays because it reminded her of childhood abuse. (Tr. 231.) Dr. Bransford stated, "[f]rom a psychiatric standpoint she shows signs of major depression, recurrent type that is severe and disabling coupled with panic disorder with agoraphobia. This is all under the umbrella of post-traumatic stress disorder." (Tr. 231.) Plaintiff was occasionally

---

[4]     Borderline personality disorder is marked by a pattern of instability in interpersonal relationships, self-image, and affects, and marked impulsivity. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 685 (American Psychiatric Association 4th ed. text revision 2000).

[5]     Clonazepam, generic for Klonopin, is a benzodiazepine indicated for treatment of seizure disorders and panic disorders. PDR at 2895.

using Alprozolam[6] for sleep.  (Tr. 231.)

Dr. Bransford completed a Psychiatric/Psychological Impairment Questionnaire on Plaintiff's behalf on August 15, 2005.  (Tr. 180-87.)  He indicated that he began treating Plaintiff in February 2005, and diagnosed her with panic disorder with agoraphobia, and PTSD.  (Tr. 180.)  He identified positive clinical findings of mood disturbance, recurrent panic attacks, persistent irrational fears, and generalized persistent anxiety, with her primary symptom being agoraphobia.  (Tr. 181-82.)  He rated Plaintiff as mildly to moderately limited in some mental activities within the context of her capacity to sustain a mental activity over a normal workday and workweek.  (Tr. 182-85.)  Dr. Bransford opined that Plaintiff's impairment would not be expected to last twelve months, and she would be capable of low stress work.  (Tr. 186.)  He also opined that her psychiatric condition did not exacerbate pain or any other physical symptom.  (Tr. 186.)  However, in September 2005, Dr. Bransford completed a PERA[7] "Medical Report Basic and Coordinated Plan" on Plaintiff's behalf and opined that she was totally and permanently disabled from engaging in any substantial gainful activity for at least one year.  (Tr. 269-72.)  He also completed a PERA "Medical Report Continuation Process" on November 20, 2006.  (Tr. 274-76.)  He indicated that Plaintiff had not improved, and was totally and permanently disabled by panic attacks with agoraphobia and PTSD.  (Tr. 275-76.)

On March 30, 2006, Dr. Edwin Anderson completed a Cervical Spine Impairment Questionnaire on Plaintiff's behalf.  (Tr. 194-200.)  He indicated that he treated Plaintiff two or

---

[6]     Alprozolam, generic for Xanax, is a benzodiazepine indicated for treatment of anxiety disorders.  PDR at 2763-64.

[7]     PERA stands for Public Employees Retirement Association.  (Tr. 276.)

9

three times a year, and diagnosed her with mild cervical spine degenerative disease, severe chronic myofascial pain syndrome, post traumatic stress disorder, agoraphobia, and panic disorder. (Tr. 194.) He noted clinical findings of limited range of motion, sensory loss from dorsolateral shoulder to fifth finger, and multiple trigger points. (Tr. 194-95.) He noted that MRIs and EMGs indicated cervical spine degenerative disease. (Tr. 195.) He described Plaintiff's symptoms as chronic pain, numbness in the right arm, and severe fatigue. (Tr. 195.) He also indicated that emotional factors contributed to Plaintiff's pain. (Tr. 198.) Dr. Anderson referred to an examination of Plaintiff that he performed on July 11, 2005, the record of which sets forth Plaintiff's functional limitations. (Tr. 197, 199.) He opined that Plaintiff could not tolerate low stress, and would be incapable of work. (Tr. 198-99.)

Ellen Tiegland, a licensed psychologist, completed a PERA "Medical Report and Basic Coordinated Plan" on June 3, 2005. (Tr. 277-80.) Tiegland indicated that she began treating Plaintiff on March 21, 2005, for post traumatic stress disorder and panic attacks with agoraphobia. (Tr. 277.) She opined that Plaintiff frequently was unable to function at home, and frequently unable to get out of bed due to stress. (Tr. 278, 280.)

Tiegland later summarized her treatment relationship with Plaintiff in a Narrative Report dated May 11, 2007. (Tr. 235-36.) Tiegland noted that Plaintiff was referred to her by Dr. Bransford for psychotherapy. (Tr. 235.) On March 21, 2005, Plaintiff presented with "a history of severe symptoms of social isolation, agoraphobia, flashbacks, nightmares, dissociative episodes, and other signs and symptoms of Post Traumatic Stress Syndrome (PTSD) primarily related to a severe motor vehicle accident in 2001." (Tr. 235.) Tiegland noted that Plaintiff reported spending her time watching tv, sleeping and eating, but she would rather be doing other

things including painting and gardening. (Tr. 235.) She was unable to do these things "primarily from anxiety, depression, and stress, rather than physical injuries, although she struggles daily with pain and discomfort . . ." Tiegland noted that Plaintiff also reported a history of childhood abuse. (Tr. 235.)

Plaintiff told Tiegland that she slid off the road while driving a school bus in the winter, and this exacerbated her fear of driving significantly. (Tr. 235.) Tiegland noted Plaintiff's anxiety level visibly increased when discussing her car accident and the incident of the school bus sliding off the road. (Tr. 235.) Tiegland noted that Plaintiff reported some improvement with Zoloft, in that she could do some activities around the house on most days, and could meet with a small group of friends for social engagements. (Tr. 235.)

However, Plaintiff still had days where she could not get out of bed. (Tr. 236.) Tiegland noted Plaintiff's bad days occurred when she had verbal contact with her parents. (Tr. 236.) Once Plaintiff recognized this and decreased contact with her parents, she had fewer days when she was unable to function. (Tr. 236.) Tiegland noted Plaintiff's continued issues included hiding when someone comes to the door, fearing her husband coming home because this caused daily "flashes" to her father coming home and what he might do, fear of driving, nightmares, very poor sleep, and becoming easily overwhelmed. (Tr. 236.) Tiegland noted, "[w]ith her progress in therapy of working through the past abuse, she continues to find additional issues that create symptoms, often things she had forgotten." (Tr. 236.) She opined that a major concern with Plaintiff working was her inability to function with consistency, and inability to drive on a daily basis. (Tr. 236.) Tiegland's narrative is supported by her treatment notes for the period between March 6, 2006 through May 31, 2007. (Tr. 260-67.)

Dr. McBride completed another Cervical Spine Impairment Questionnaire on Plaintiff's behalf on February 5, 2007. (Tr. 250-56.) He diagnosed chronic/permanent cervico-thoracic sprain-strain with myofascitis, headaches, and right cervical radiculitis. (Tr. 250.) He noted clinical findings of limited range of motion, decreased flexion, decreased extension, sensory loss, tenderness, swelling, muscle spasm, and muscle weakness. (Tr. 250-51.) Dr. McBride opined that physical activities and post traumatic stress disorder are precipitating factors leading to her pain. (Tr. 252.) He further opined that Plaintiff could sit for four hours in an eight hour workday, and stand or walk for four hours, but would need to get up and move around every thirty minutes, and sit again after five or ten minutes. (Tr. 253.) He also indicated Plaintiff had very limited lifting and carrying abilities. (Tr. 253.)

Dr. McBride opined Plaintiff would need unscheduled breaks from work every one or two hours, for five to fifteen minutes. (Tr. 255.) He opined that Plaintiff's other limitations were no pushing and pulling, and psychological limitations. (Tr. 256.)

### C.    Hearing Before the ALJ

Plaintiff testified at the hearing before the ALJ on May 14, 2007. (Tr. 281-301.) She testified that she has a high school education, and her last job was as a school bus driver. (Tr. 285.) She also had work experience as a personal care attendant for a special needs child. (Tr. 286-87.) Plaintiff testified that she is married and has two children, aged thirty and twenty-seven. (Tr. 287.)

Plaintiff also testified that she does some housework, but not vacuuming because it hurts her right shoulder and arm. (Tr. 288.) Her pain is usually inflammation type pain. (Tr. 289.) Although she likes to paint, she can not do it for long because it is painful. (Tr. 289.) Plaintiff

estimated that when she is sitting, she can paint for an hour.  (Tr. 289.)  Her pain is usually at a

level of seven out of ten, but about once or twice a month it is worse.  (Tr. 290.)  The pain also

goes into her neck.  (Tr. 290.)  The pain stemmed from a car accident.  (Tr. 291.)  The right side

of her neck, shoulder, and arm either feel like they are on fire, or are completely numb.  (Tr.

291.)

Plaintiff testified that she has no difficulty walking, but standing in one place causes pain

in her shoulder.  (Tr. 292-93.)  She testified that she can sit for an hour before she starts to feel

the pain in her neck and shoulder.  (Tr. 294.)  She estimated that if she got up and walked around

for thirty minutes, she could sit for another hour.  (Tr. 294.)

Plaintiff also testified about her psychological problems.  (Tr. 295.)  She explained that

she becomes afraid anytime something reminds her about the car accident.  (Tr. 295.)  She

testified that she was having nightmares, and wasn't sleeping well.  (Tr. 295.)  She can sleep

when she takes Clonazepam.  (Tr. 295.)  Plaintiff testified that she can drive very little because

of post traumatic stress disorder.  (Tr. 296.)  She can't even ride in a car in bad weather, unless

she takes medication and goes to sleep.  (Tr. 296.)  Plaintiff described an incident where she was

packing for a trip ten days in advance, and had to cancel when she panicked at the thought of

going.  (Tr. 296.)

Plaintiff further testified that even if she could get to a job, she could not work because

she is afraid of people judging her.  (Tr. 297.)  She explained that she has difficulty interacting

with acquaintances, but strangers don't really bother her.  (Tr. 297.)

Plaintiff testified about what happened after her car accident.  (Tr. 297.)  She was off

work for one year, but she went back because she thought if she didn't, she would never get in a

vehicle again. (Tr. 297.) She described her post traumatic stress symptoms as having flashes of bad memories during the day that caused panic attacks. (Tr. 299.) Such episodes occurred several times a week, and she could not tolerate noise when having a panic attack. (Tr. 299.) When this happened, she usually had to lie down in total quiet for an hour. (Tr. 299.) She also had crying spells when she panicked. (Tr. 300.)

William Rutenbeck testified as a vocational expert. ("VE") (Tr. 301.) The ALJ asked him whether a person with the same educational and vocational background as Plaintiff, who had impairments of myofascial pain syndrome, degenerative changes of the cervical spine, post traumatic stress disorder, major depressive disorder, recurrent, borderline personality disorder, panic disorder with agoraphobia, anxiety, chronic cervical spine sprain/strain, fibromyalgia, and restless leg syndrome, who is limited to light work that is unskilled, with brief and superficial contact with co-workers and supervisors, no rapid or frequent changes in work routine, and no operation of motor vehicles could work as a school bus driver. (Tr. 302.) Mr. Rutenbeck responded in the negative, but testified that such a person could perform other work such as housecleaner, and packaging assembly jobs. (Tr. 303.)

The ALJ then asked if the VE's testimony would be different if the RFC were reduced to a sedentary level. (Tr. 303.) The VE responded that there would be assembly and inspection jobs that such a person could perform. (Tr. 303.) The VE testified that if the individual were limited to light work with only occasional pushing or pulling, it would not change his testimony. (Tr. 303.) He further testified that if the individual was limited to sedentary work with occasional neck rotation and flexion, no constant lifting, no overhead reaching, no firm gripping or fine manipulation with the right hand, there would be no such jobs such a person could

perform. (Tr. 303-04.) He also testified such a person would not be competitively employable if she were absent from work three or more days a month, and needed to take unscheduled breaks of unspecified duration. (Tr. 304.) Finally, the VE testified that a person, under the first hypothetical question, whose psychological and pain symptoms would interfere with her attention and concentration frequently, defined as one third of the time, could not perform the jobs he had identified. (Tr. 304-05.)

### D. The ALJ's Decision

At the first step of the disability evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 4, 2005, the alleged onset date. (Tr. 27.) At the second step of the evaluation, the ALJ found that Plaintiff had severe impairments of myofascial pain syndrome, degenerative disc disease of the lumbar spine, an affective disorder, and an anxiety disorder. (Tr. 27.) The ALJ concluded that Plaintiff did not have a physical or mental impairment that met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.) In analyzing Plaintiff's mental impairments, the ALJ concluded that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence or pace, and no episodes of decompensation. (Tr. 18.)

At step four of the evaluation, the ALJ found Plaintiff to have the residual functional capacity to perform light work[8] involving no operation of motor vehicles, only occasional

---

[8] Light work is defined as lifting no more than twenty pounds at a time, with frequent lifting and carrying up to ten pounds, a "good deal of walking or standing" or sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

pushing or pulling, and work that is unskilled, requiring no more than brief and superficial contact with co-workers and supervisors, and no rapid or frequent changes in work routine. (Tr. 29.) The ALJ concluded that the claimant could not perform her past relevant work. (Tr. 32.) However, the ALJ concluded that the claimant could perform other jobs that exist in significant numbers in the national economy. (Tr. 32.) Thus, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act. (Tr. 33.)

## III.    STANDARD OF REVIEW

Judicial review of defendant's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1994). Substantial evidence is enough evidence that a reasonable person might accept as adequate to support a conclusion. Dixon v. Barnhart, 353 F.3d 602, 604 (8th Cir. 2003). Where such evidence exists, a court is required to affirm defendant's factual findings. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). On the other hand, the analysis must include evidence in the record which detracts from the weight of the evidence supporting the ALJ's decision. Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). Thus, the court must consider the weight of the evidence in the record and apply a balancing test to evidence which is contrary. Id.

## IV.    DISCUSSION

Plaintiff alleges two errors in the ALJ's decision. Under the five-step disability evaluation process, the first issue Plaintiff raises is whether she met or equaled a listed impairment at step three of the evaluation. The second issue is whether, in determining Plaintiff's residual functional capacity at step four of the evaluation process, the ALJ failed to

give adequate weight to the treating physicians' opinions, and Plaintiff's testimony.

## A.    <u>Listed Impairments</u>

Plaintiff contends that she met or equaled physical and psychological listed impairments, either standing alone, or in combination.  In support of her contention that she met a physical listed impairment, Plaintiff cited Dr. Edwin Anderson's opinion that she

> "suffered frequent pain that could not be alleviated, that she would need 'to get up and move around' at least hourly, that her lifting and carrying of up to ten pounds would be limited and she could never lift or carry more than 10 pounds, that she was 'very limited' in grasping, turning or twisting objects, and 'moderately limited in using her hands and fingers for fine manipulations or using her arms for reaching,' . . . and she should not engage in pushing, pulling, kneeling, bending, and stooping."

(Memorandum In Support of Plaintiff's Motion for Judgment on the Pleadings, Docket No. 16, "Pltf's Mem." at 9.)  With respect to her mental impairments, Plaintiff argued her psychiatrist and therapist have stated that,

> Plaintiff demonstrates a "marked limitation" of the ability to maintain attention and concentration, the ability to perform activities within a schedule, the ability to maintain regular attendance and punctuality, the ability to work in coordination with or in proximity of others without being distracted, the ability to complete a normal work week without an unreasonable number and length of rest periods, and the ability to accept instruction or criticism.

(Pltf's Mem. at 9.)

Defendant argues that there is no objective medical evidence to support Plaintiff's claim of disability due to her back impairment.  Defendant also contends that Plaintiff did not meet or equal a listed mental impairment.  Defendant argues Plaintiff's treating psychiatrist, Dr. Bransford, never opined that Plaintiff suffered from marked restrictions in all areas of mental

functioning, he found only mild to moderate limitations. Defendant asserts that although Plaintiff's therapist, Ellen Tiegland, believed that Plaintiff suffered from greater restrictions, her opinion could not be granted greater weight than Dr. Bransford's opinion. In support of this contention, Defendant cites the regulation concerning acceptable medical sources, 20 C.F.R. § 404.1513. (Defendant's Memorandum in Support of Motion for Summary Judgment, Docket No. 21, "Def's Mem." at 18-21.)

The listing of impairments in 20 C.F.R. § 404, Subpt. P., Appendix 1 describes, for each of the major body systems, impairments that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his age, education or work experience. 20 C.F.R. § 404.1525(a). An impairment can not meet the criteria of a listed impairment based only on a diagnosis, the claimant must have an impairment that satisfies all of the criteria of a listed impairment. 20 C.F.R. § 404.1525(d); see also Randolph v. Barnhart, 386 F.3d 835, 840-41 (8th Cir. 2004) (comparing Listing criteria to DSM-IV criteria).

Neither party cited a specific physical or psychological listed impairment that applies in Plaintiff's case. The ALJ found that Plaintiff has severe impairments of myofascial pain syndrome, degenerative disc disease of the cervical spine, an affective disorder, and an anxiety disorder. There is no listing for myofascial pain. Listing 1.04(A) applies to degenerative disc disease, and is met under the following conditions:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-

> anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Listing 1.04(A), 20 C.F.R. 404, Subpart P, Appendix One.  There is no objective evidence that Plaintiff's degenerative disc disease results in compromise of a nerve root or the spinal cord. Her MRI indicated only minimal spur and annulus changes at the C2-C3 level.  (Tr. 129.) Therefore, she does not meet or equal Listing 1.04(A).

The ALJ found that Plaintiff has severe mental impairments of an affective disorder, and an anxiety disorder.  The applicable listings for these disorders are § 12.04 affective disorders, and § 12.06 anxiety disorders.  The parties dispute only whether Plaintiff satisfies the part B criteria, which is the same for Listings 12.04 and 12.06.  Under the part B criteria, the ALJ must determine whether the mental impairment results in at least two of the four listed functional limitations.  Pyland, 149 F.3d at 877 (8th Cir. 1998).  Specifically, Plaintiff must prove that her affective disorder and/or anxiety disorder, alone or in combination with her physical impairments, resulted in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 404, Subpart B, Appendix One, § 12.04(b); 12.06(b).  If no single impairment meets or equals a listed impairment, the combined effect of the impairments must be considered.  Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003).

The ALJ found Plaintiff to have mild restrictions in activities of daily living because she could independently care for herself and her household.  (Tr. 28.)  The ALJ noted Plaintiff's

limitations in daily activities were due to physical, not mental limitations. Based on this finding, it is apparent that the ALJ failed to consider whether Plaintiff's physical and mental impairments in combination resulted in marked restrictions of daily living. However, even assuming that Plaintiff's combination of impairments resulted in marked restrictions of daily living, Listings 12.04 and 12.06 can only be equaled if Plaintiff suffered marked restrictions in another area of functioning.

The ALJ found Plaintiff to have moderate difficulties in social functioning. (Tr. 28.) In support of this conclusion, he noted that Plaintiff related appropriately to all treating and examining sources, maintained stable interpersonal relationships and friendships, and was able to go out in public to the grocery store, and to church. (Tr. 28.) The ALJ found Plaintiff's limitations to be moderate because the record indicated increasing social isolation. (Tr. 28.)

The ALJ also found Plaintiff to have moderate difficulties in concentration, persistence, or pace. (Tr. 28.) The ALJ noted that Plaintiff was alert and oriented, and able to sustain attention and concentration during an examination on March 23, 2005. (Tr. 28.) He also noted that there are no treatment records documenting any concerns regarding Plaintiff's cognitive abilities, and no other mental status examinations in the record. (Tr. 28.) He found Plaintiff to have moderate difficulties in concentration, persistence or pace based on her own testimony. (Tr. 28.) The parties do not dispute the ALJ's finding that Plaintiff did not have any episodes of decompensation. (Tr. 28.)

Plaintiff asserts that her therapist, Ellen Tiegland, completed a Psychiatric/Psychological Impairment Questionnaire on June 12, 2006, and found marked limitations in a number of areas including Plaintiff's ability to maintain attention and concentration, and to accept criticism or

instruction. (Pltf's Mem. at 6). The Court, however, cannot find any such document in the record.[9]

The record indicates that Tiegland opined a "major concern" with Plaintiff's ability to work was her inability to function with consistency. (Tr. 236.) In general, Tiegland's treatment notes reflect Plaintiff feeling stressed and anxious, sometimes in response to situational stressors, other times in response to irrational fears or bad memories. (Tr. 260-68.) This does not easily translate into a specific level of functional impairment.

The ALJ's analysis of Plaintiff's limitations in concentration, persistence, or pace suffers from the same deficiency as his analysis of Plaintiff's daily activities. The ALJ failed to consider whether Plaintiff's physical and mental impairments in combination caused a marked restriction in Plaintiff's ability to maintain concentration, persistence or pace. In September 2005, Dr. Anderson opined that Plaintiff's experience of pain, fatigue, or other symptoms are frequently severe enough to interfere with her concentration, persistence or pace. (Tr. 144.) In March 2006, Dr. Anderson opined that these symptoms were constantly severe enough to interfere with her concentration, persistence, or pace. (Tr. 198.) Similarly, in August 2005 and again in February 2007, Plaintiff's chiropractor indicated that Plaintiff's pain or fatigue would frequently interfere with her attention and concentration. (Tr. 177, 254.) Drs. Anderson and McBride opined that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. (Tr. 197, 176, 144.) Significantly, the physician who performed Plaintiff's consultative examination, Dr. Roger Ralston, suspected that Plaintiff had a

---

[9]     The Commissioner also noted he could find no such document. (Def's Mem. at 7, n.5).

"significant nerve rootlet contusion with resultant symptoms that are aggravated by post traumatic stress disorder." (Tr. 134.) The ALJ failed to discuss this evidence or make any comment on the combined effect of Plaintiff's physical and mental impairments in evaluating whether she equaled Listing 12.04 or 12.06. Remand is required to address this deficiency.

### B.     <u>Residual Functional Capacity</u>

"The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." <u>Casey v. Astrue</u>, 503 F.3d 687, 696-97 (8th Cir. 2007) (quoting <u>Harris v. Barnhart</u>, 356 F.3d 926, 929 (8th Cir. 2004)) (additional citations omitted). RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004) (quoting 20 C.F.R. § 404.1545(a)). In determining RFC, "the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." <u>Id.</u> at 738 (citing 20 C.F.R. § 404.1545(c)); <u>Baldwin v. Barnhart</u>, 349 F.3d 549, 556 (8th Cir. 2003)). The ALJ must evaluate evidence in the record of the various physicians' opinions and the credibility of Plaintiff's subjective complaints. <u>See</u> <u>Id.</u> (evaluating ALJ's RFC determination).

### 1.     <u>Weighing Source Opinions</u>

Plaintiff contends all of the professionals who treated her opined that she was disabled, and the ALJ should have granted great weight to their opinions. Defendant contends Dr. Anderson's opinion of disability is not supported by objective medical evidence, and Dr. McBride's opinion is not entitled to the same weight as a treating physician because he is a chiropractor, not a medical doctor. Defendant admits the ALJ did not review Tiegland's

treatment notes, but argues her opinion cannot be entitled to more weight than Dr. Bransford's opinion because he was an acceptable medical source, and her supervisor.

Beginning with Plaintiff's physical RFC, the ALJ rejected treating physician Dr. Anderson's opinion, and chiropractor Dr. McBride's opinion. The ALJ reasoned that their opinions were based on the claimant's subjective complaints, which he found not credible, and their opinions were not well supported by clinical findings, laboratory and diagnostic techniques, and not consistent with other substantial evidence in the record. (Tr. 31-32.) The ALJ concluded that Plaintiff retained the residual functional capacity to perform a limited range of unskilled light work. (Tr. 29.)

The ALJ gave significant weight to the opinion of the state agency psychological consultants, which the ALJ found to be consistent with Plaintiff's moderate limitations. (Tr. 32.) The ALJ noted that Dr. Bransford "throughout the record opined the claimant was disabled," but Dr. Bransford specifically assigned only moderate work restrictions to Plaintiff. (Tr. 32.) The ALJ found no evidence in the record to support Dr. Bransford's opinion that Plaintiff was disabled, so he did not grant his opinion of disability controlling weight. (Tr. 32.) The ALJ concluded that Plaintiff retained the psychological residual functional capacity to perform work requiring no more than brief and superficial contact with coworkers and supervisors, and no rapid of frequent changes in work routine. (Tr. 32.)

Acceptable medical sources are licensed physicians and licensed or certified psychologists. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007); 20 C.F.R. § 404.1513(a). Chiropractors fall into the category of "other medical sources." Sloan, 499 F.3d at 888. Three major distinctions between "acceptable medical sources" and "other sources" are: (1) only

acceptable medical sources can establish the existence of a medically determinable impairment;

(2) only acceptable medical sources can provide medical opinions; and (3) only acceptable

medical sources can be considered treating sources.  Id.  Information from "other sources" may

provide insight into the severity of an impairment and how it affects an individual's ability to

function.  Id.

A treating physician's opinion is typically entitled to controlling weight if it is well-

supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not

inconsistent with other substantial evidence"  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir.

2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (additional citation

omitted)).  The ALJ may reject the opinion of any medical expert, whether hired by the claimant

or the government, if the opinion is inconsistent with the record as a whole.  Wagner v. Astrue,

499 F.3d 842, 848 (8th Cir. 2007).    A nonexamining consultant's opinion is generally, but not

always, entitled to less weight than an examining source's opinion.  Wilcockson v. Astrue, 540

F.3d 878, 880 (8th Cir. 2008); 20 C.F.R. 404.1527(d)(1).

Here, the ALJ did not discuss the opinion of Ellen Tiegland, a licensed psychologist who

treated Plaintiff in psychotherapy.  Tiegland opined that Plaintiff was disabled because she was

"virtually unable to get out of bed each morning and do day to day chores & activities at home

most days.  She is unable to drive a car most of the time."  (Tr. 280.)  As a licensed psychologist,

Tiegland is an acceptable medical source, and the ALJ erred by failing to consider her opinion.

Dr. Bransford's opinion is not entitled to greater weight simply because he is a psychiatrist

rather than a licensed psychologist.  The ALJ must consider their conflicting opinions, and give

reasons for accepting Bransford's opinion over Tiegland's opinion.  See Johnson v. Apfel, 240

F.3d 1145, 1148 (8th Cir. 2001) (ALJ must resolve conflicts among the treating and examining physicians); Ribar v. Barnhart, 199 F.Supp.2d 917, 920-21 (S.D. Ia. 2002) (ALJ erred by ignoring opinion of licensed psychologist).

The ALJ declined to give great weight to the opinions of Plaintiff's chiropractor and her treating physician regarding her physical restrictions, and gave appropriate reasons for doing so. The ALJ noted that objective findings of myofascial pain syndrome and degenerative disc disease were minimal; Plaintiff underwent only conservative treatment for pain; she could cook, garden, do light housework, paint, read and watch television; and she worked two jobs after her allegedly disabling accident in 2001. (Tr. 30-31.) Nonetheless, the ALJ found that Plaintiff had medically determinable physical impairments that cause pain, and the record contains no medical opinions other than Drs. Anderson and McBride regarding the functional restrictions caused by Plaintiff's physical impairments. Dr. Roger Ralston performed a physical consultative examination, but did not opine as to Plaintiff's residual functional capacity. (Tr. 132-35.) A state agency physician, Dr. Abdallah Helou, reviewed the record on April 29, 2005, and opined that there was no musculoskeletal explanation for the pain and numbness in Plaintiff's neck, shoulder, and arm. (Tr. 137-38.) However, he did not opine as to Plaintiff's physical residual functional capacity. When an ALJ fails to rely on medical evidence to determine Plaintiff's residual functional capacity, remand is required for further development of the record. Rodewald v. Astrue, Civ. No. 08-5911RHK/SRN, 2009 WL 1026286, at *21 (D.Minn. April 16, 2009); see Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (even if ALJ gave valid reasons for discounting medical professionals' opinions, some medical evidence must support RFC determination). As noted above, the ALJ must also consider the combined effect of

Plaintiff's physical and mental impairments on her functional ability to do work.  In other words, the ALJ must consider whether Plaintiff's mental impairments contribute to the severity of her physical symptoms and limitations.  See Delrosa v. Sullivan, 922 F.2d 480, 485-85 (8th Cir. 1991) (remanding for consideration of whether claimant's perception of pain is exacerbated by a psychological impairment).

## V.  RECOMMENDATION

For the foregoing reasons, it is hereby recommended that:

1. Plaintiff's Motion for Judgment on the Pleadings be granted in part [Docket No. 15];

2. The case be remanded for further proceedings consistent with this Report and Recommendation, pursuant to sentence four of 42 U.S.C. § 405(g); and

3. Defendant's Motion for Summary Judgment be denied. [Docket No. 20].

DATED: July 9, 2009

*s/ Franklin L.  Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **July 23, 2009,** written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words.  A judge shall made a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.